IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| CLIFTON HERD, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:14-cv-03433-NKL |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Clifton Herd appeals the Commissioner of Social Security's final decision denying his application for disability insurance benefits. The decision is affirmed.

**I.  Background**

Herd was born in 1969. He filed his application for disability benefits in June 2010, alleging he became disabled beginning December 27, 2007, due to physical and mental health impairments. The ALJ denied his application in August 2010, but the Appeals Council vacated and remanded, instructing the ALJ to obtain evidence from a medical expert concerning Herd's thyroid cancer. A second hearing was held on Herd's application in April 2013, and Herd amended his alleged onset date to March 27, 2010. In May 2013, the ALJ for a second time denied Herd's application for benefits.

Herd's insured status expired June 30, 2010. To be eligible for disability benefits under Title II of the Act, Herd is required to show he was disabled prior to June 30, 2010. 20 C.F.R. § 404.130; *Moore v. Astrue,* 572 F.3d 520, 522 (8th Cir. 2009). In Herd's present appeal, he focuses on mental health issues.

### A. Medical history and opinion evidence

On April 15, 2010, Herd visited Keith Eiche, Ph.D., a psychologist at the Veterans Administration hospital, reporting frustration with his medical providers and at being denied disability. Herd initially expressed a great deal of anger in the session and was not sure about pursuing therapy. Mental status examination showed psychomotor agitation, though Herd calmed as the session progressed. Herd's speech was louder than normal with an intense quality, he had an irritable mood and affect, and he had a restricted range. Dr. Eiche diagnosed depressive disorder, and advised a medication consultation with Matthew Masterson, M.D., a psychiatrist at the VA.

Herd next saw Dr. Eiche on May 11, 2010. The doctor noted Herd's thoughts were logical, linear, and goal directed. Herd showed psychomotor agitation at the beginning of the session, but Herd calmed as the session progressed. His speech had a normal rate and rhythm but was louder than normal volume, and was intense. His mood was irritable, and his affect was congruent and had restricted range. Herd denied any current homicidal or suicidal ideation. His insight, judgment, and impulse control appeared grossly intact and his eye contact was good.

Herd saw Dr. Masterson on May 12, 2010, for an initial session. Herd reported feeling paranoid, irritable, and angry most of the time. Mental status examination showed Herd presented in a very angry and intimidating way, used profanity freely, and had a hostile, angry, and intimidating affect with a restricted range. Herd's thought content was overly focused on how the VA and others had been unfair toward him; demonstrated a paranoid and rigid way of thinking; and was circumstantial and overly inclusive. It was difficult to direct Herd back to topic without increased frustration and anger. He had mildly distracted concentration, impaired judgment, and limited insight. Dr. Masterson diagnosed intermittent explosive disorder (IED),

2

depressive disorder, and personality disorder. Dr. Masterson wrote in the treatment notes that Herd was unemployable in his current condition because his anger was so intense, "unless employed at a job where explosive anger was accepted and tolerated." [Tr. 489.] Dr. Masterson stated Herd had a rigid and inflexible approach to problem solving and interacting with others, and demonstrated symptoms consistent with a personality disorder with cluster A and C traits. Dr. Masterson prescribed carbamazepine, to be adjusted as tolerated, and clonazepam, and noted that use of sertraline in the future would be considered.

Herd's wife called Dr. Masterson's office on May 17, 2010, reporting that she had been "babysitting" Herd since he had started clonazepam and carbamazepine; and that he had been very angry, uncoordinated, unable to get his words out, and very agitated. [Tr. 484.] She had told Herd to stop taking the medications because of the side effects. Herd spoke with Dr. Masterson the same day, reporting he felt more disinhibited on his medications and more likely to say or do something when he was angry, but he said he had not been aggressive and was sleeping a little longer. Dr. Masterson stopped the clonazepam but continued the carbamazepine.

Herd called and spoke to a nurse on May 19, 2010, shouting that he was not suicidal or homicidal, but "I need to tell you how ****ing pissed off I am," and venting for 20 minutes. [Tr. 479.] He said he was not interested in following directions from others and that he did things his own way. Herd was calmer at the end of the call, and his speech was more relaxed.

Herd spoke by phone with Dr. Masterson on May 27, 2010, reporting he was a little more irritable after being on medication for five days. He reported side effects such as feeling more fatigued, difficulty remembering or doing calculations, and sporadic sharp pains in various parts of his body. Herd agreed to Dr. Masterson's recommendation to increase his dose of

carbamazepine. Dr. Masterson told Herd to continue on the medication to see if the side effects resolved, and that the medications could be changed if Herd's symptoms increased.

Herd spoke to Dr. Masterson on June 3, 2010, reporting that he was sleeping ten to twelve hours a day on the increased dose of carbamazepine. Herd said he had no energy, felt dizzy upon standing, and that his anger and irritability persisted. Dr. Masterson told Herd the side effects were from the carbamazepine and to stop taking it, and said they would discuss medication options at the next office visit.

Herd had an appointment with Dr. Masterson on June 9, 2010, and reported he had blown up on the drive there. Dr. Masterson emphasized that Herd needed to learn to identify triggers to his anger and make mental decisions to react differently. Herd acknowledged he was able to delay his anger at times, but at other times he was not. He said his physical impairments had taken away his ability to vent his frustration in positive ways. Dr. Masterson noted that Herd walked with an antalgic gait, wore a knee brace, and used a cane. Mental status examination showed Herd was less angry; had loud and forceful speech; used profanity freely; had an angry, irritable, and occasionally intimidating affect; and had a restricted range. Herd had a history of violence and domestic assault, was overly focused on how others had treated him, and demonstrated some paranoid and rigid ways of thinking. Herd's thought process was circumstantial and overly inclusive, and he was difficult to direct back to topic. Herd was mildly distracted, had limited insight, impaired judgment, and high impulsivity. Dr. Masterson ordered a trial of alprazolam.

Dr. Masterson completed a Medical Source Statement-Mental, dated July 15, 2010. He opined that Herd was markedly limited in his abilities to work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; get

along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriately behavior and adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting. He opined that Herd was extremely limited in his ability to accept instructions and respond appropriately to criticism from supervisors. He further opined that Herd was extremely limited in his ability to complete a normal workday and workweek without interruption from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods.

Geoffrey Sutton, Ph.D., a non-examining, State agency consultant, completed a Psychiatric Review Technique Form and Mental Residual Functional Capacity Assessment in August 2010. He opined that Herd had moderate limitations in activities of daily living, social functioning, and concentration, persistence, or pace; moderate limitations in his ability to interact with the general public, and accept instructions and respond appropriately to criticism from supervisors; and moderate limitations in responding appropriately to changes in the work setting. The opinion was accompanied by a narrative describing Herd's history and treatment, and explaining the findings. [Tr. 515.] Dr. Sutton noted Herd had no diagnosis of cognitive disorder that would be related to alleged marked deficits in memory or understanding. Herd had not regularly taken medications before June 30, 2010, nor participated in other psychological interventions to determine their effectiveness. Dr. Sutton opined, "It is reasonable that with treatment, including medication compliance, that [Herd] would be able to perform work duties" consistent with the limitations described in the Psychiatric Review Technique and Mental Residual Functional Capacity Assessment. [*Id.*]

After June 30, 2010, Herd continued to be seen by Dr. Eiche and Dr. Masterson. Both doctors continued to diagnose Herd with multiple mental problems including IED, depressive

5

disorder, personality disorder, and anxiety. Herd continued to take medication after June 30, 2010 and was improved but his mental illness symptoms would wax and wane.

## B. Herd's testimony, self-reports[1], and earnings history

Herd has a high school education. He served in the military for about two years where he was trained to operate heavy machinery, and was honorably discharged in 1991. From 1996 to 2005, he worked at different bars as a bartender, bouncer, and bar manager. He stopped working in 2005.

Herd testified that he stopped working because of coughing fits, and because he had to have surgery for problems related to a wreck he had had five years earlier. [Tr. 127.] But, he testified, "the biggest reason is that the weather affects this coughing…that I have with bronchiectasis." [*Id.*] Herd explained that his bronchiectasis causes breathing problems and severe coughing depending on the weather, especially when the humidity is high. He described the coughing fits: "A lot of times I'll be on my hands and knees and I'll be coughing to the point to where I'm gagging so hard, that bile and stuff will come up. I've popped blood vessels all through my face, my eyes, whenever they happen. And there's been times they've been bad enough that I just wish I would just die." [Tr. 131,136.] He testified the coughing fits can happen once a day to once a week, and can last from 15 minutes to an hour and a half. [Tr. 90, 137.] Herd also testified he has problems with his right shoulder that cause him difficulty reaching overhead, and lifting and carrying; constant pain in his hip, knees, and foot that prevent him from standing a long time or bending, and require him to use a cane to walk; and problems with fatigue that may exacerbate his pain symptoms.

Herd testified about his diagnoses of severe depression and intermittent explosive

---

[1] Exhibits C2E and C4E, Herd's "Disability Report—Adult" and "Function Report—Adult". [Tr. 398-406, and Tr. 413-421.]

6

disorder. He said the severe depression comes from not being able to do physical things the way he used to, such as mow his yard or hike in the woods. On days his depression seems worse, he sleeps a lot and tries to avoid the people who are in his house. He experiences paranoia, does not do well with the public, and cannot sit with his back to a door or window. He said people such as his neighbors, or shoppers at a store, usually do something he considers stupid or rude, and "it'll set [him] off[,]" he "can't keep [his] mouth shut[.]" [Tr. 96.] He can have a meltdown over major, as well as very minor, things.

Herd lives with his wife. He goes outside when it is not humid. He watches television and goes on Facebook to "see how [his] friends are doing." [Doc. 100.] He phones friends or family every day. He can help prepare food but cannot be around cooking steam or smoke. He does not do laundry. He goes to the store at times of day when there will be fewer people.

Herd testified that his descriptions of his physical and mental issues, and day-to-day activities, applied to the June 2010 period.

Herd has had no reported earnings since 2006. Prior to that time, Herd had two years of earnings less than $3,500; from 1990 through 2005, Herd's earnings exceeded $12,000 twice; and Herd's year of highest earnings was 1991, when he earned about $20,000.

### C. The ALJ's decision

The ALJ found that through June 30, 2010, the date last insured, Herd had severe impairments of bronchiectasis; morbid obesity; plantar fasciitis; chronic tendinitis of the ankle; history of right shoulder arthroscopy and clavicle resection; degenerative disc disease of the lumbar spine; degenerative joint disease of the bilateral knees; intermittent explosive disorder; and depressive disorder. [Tr. 13.] The ALJ also found Herd did not meet Listing 12.04, Affective Disorders, or Listing 12.08, Personality Disorders.

7

The ALJ found Herd has the residual functional capacity to perform:

> [S]edentary work as defined in 20 CFR 404.1567(a), in that he could lift and/or carry 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk 2 hours in an 8- hour workday; sit 6 hours in an 8-hour workday; perform no repetitive pushing/pulling with the bilateral lower extremities; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; had the credible need to use a cane for ambulation and balance; could never reach overhead with the right, dominant upper extremity; needed to avoid moderate exposure to temperature extremes, humidity, wetness, vibration, pulmonary irritants such as chemicals, fumes, dust, gases, and hazards such as unprotected heights and dangerous moving machinery; and could perform simple, routine tasks requiring no contact with the general public and only occasional interaction with coworkers and supervisors.

[Tr. 17.] The ALJ further found Herd's "descriptions of his symptoms and limitations are generally inconsistent, unpersuasive, and unsupported by the overall record." [Tr. 18.] The ALJ gave little weight to the opinions of Drs. Eiche and Masterson, and significant weight to the opinion of Dr. Sutton. The ALJ concluded Herd was not disabled.

## II.  Discussion

Herd argues the ALJ's credibility determination is not supported by substantial evidence; that the ALJ should have given controlling or at least significant weight to the opinions of Drs. Eiche and Masterson; and that the ALJ's failure to consider Herd's personality disorder at Step 2 prejudicially affected the ALJ's determination of Herd's RFC.

The Commissioner's findings are reversed "only if they are not supported by substantial evidence or result from an error of law." *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support the Commissioner's conclusions. *See Juszczyk v. Astrue,* 542 F.3d 626, 631 (8th Cir. 2008). "If substantial evidence supports the Commissioner's conclusions,

[the Court] does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Byers*, 687 at 915.

### A. Credibility analysis

Herd argues that in discounting the credibility of his testimony, the ALJ failed to perform a proper credibility analysis.

Credibility is "primarily for the ALJ to decide, not the courts." *Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009) (internal quotation and citation omitted). When an ALJ determines a claimant is not credible and decides to reject the claimant's statement, the ALJ must provide specific reasons for the credibility finding. *See Delrosa v. Sullivan*, 922 F.2d 480, 485 (8th Cir. 1991); *Prince v. Bowen*, 894 F.2d 283, 296 (8th Cir. 1990). The ALJ must specifically consider evidence related to the claimant's work record; daily activities; "the duration, frequency and intensity of pain; the precipitating and aggravating factors; the dosage and side effects of medication; and functional restrictions." *Delrosa*, 922 F.2d at 485 (citing *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984)); *see also* 20 C.F.R. 404.1529 and 416.929 (codifying the *Polaski* factors). *Compare Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) ("Subjective complaints may be discounted if the evidence as a whole is inconsistent with the claimant's testimony.") A reviewing court normally defers to an ALJ's credibility finding if the ALJ explicitly discredits the claimant's testimony and gives good reason for doing so. *Halverson v. Astrue,* 600 F.3d 922, 931 (8th Cir. 2010) (citation omitted).

Here, the ALJ found Herd's descriptions of symptoms and limitations inconsistent, unpersuasive, and unsupported by the record as a whole. The ALJ explicitly addressed the *Polaski* factors. Prior to the date last insured, Herd did not receive treatment indicative of disabling conditions. The medical records of April, May and June 2010 reflect that prior to the

9

date last insured, Herd had mental health-related appointments with a psychologist, Dr. Eiche. Herd also began seeing a psychiatrist, Dr. Masterson, in May 2010 to begin medication, and saw the doctor again in May and June 2010 for medication management. Herd had no hospitalizations, nor did the doctors recommend any. Herd also did not explain why he sought psychological treatment immediately before his insured status lapsed given that there is no evidence in the record that this was a sudden onset of mental illness.

The conservative nature of Herd's treatment of record for the period prior to June 30, 2010 does not, as Herd suggests, implicate a brief period of lull in his mental health symptomatology. He does not explain any cause for such a lull, and he points to no medical evidence to support that argument.

The ALJ also addressed Herd's work history. Herd has had no reported earnings since 2006. Prior to that time, Herd had two years of earnings less than $3,500; from 1990 through 2005, Herd's earnings exceeded $12,000 only twice; and Herd's year of highest earnings was 1991, when he earned about $20,000. A claimant's credibility may be lessened by poor work history. *Woolf v. Shalala,* 3 F.3d 1210, 1214 (8th Cir. 1993). *See also Pearsall v. Massanari,* 274 F.3d 1211, 1218 (8th Cir. 2001) ("A lack of work history may indicate lack of motivation to work rather than lack of ability.") (*citing Woolf,* 3 F.3d at 1214). Furthermore, the record reflects Herd stopped working in 2005 for reasons unrelated to mental health issues. Herd admitted that the biggest reason he could no longer work was coughing fits.

The ALJ assessed Herd's testimony and allegations in light of that record as a whole, and as discussed above, that record contains substantial evidence to support the ALJ's credibility evaluation. When substantial evidence on the record as a whole supports the ALJ's credibility finding, it should not be disturbed. *See Peña v. Chater,* 76 F.3d 906, 908 (8th Cir. 1996).

**B. Weight given treating mental health providers' opinions**

Herd argues that ALJ should have given controlling weight to the opinions of Drs. Eiche and Dr. Masterson, who treated Herd before the date last insured, rather than little weight.

An ALJ is not required to give the most weight to the opinion of a treating medical source. The amount of weight given a treating medical source opinion depends upon support for the opinion found in the record; its consistency with the record; and whether it rests upon conclusory statements. An ALJ must give controlling weight to a treating medical source opinion if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence. *Papesh v. Colvin,* 2015 WL 3396586, at *5 (8th Cir. May 27, 2015) (*quoting Wagner v. Astrue,* 499 F.3d 842, 848-49 (8th Cir. 2007)). Under S.S.R. 96-2p, "Policy Interpretation Ruling, Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions," the term "'not inconsistent'…indicate[s] that a well-supported treating source medical opinion need not be supported directly by all of the other evidence (*i.e.*, it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion." 1996 WL 374188 (July 2, 1996),

"Even if the [treating physician's] opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight." *Papesh,* WL 3396586, at *5 (*citing Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007)). The opinion may have "limited weight if it provides conclusory statements only, or is inconsistent with the record." *Id*. (citations omitted). The ALJ "may discount or even disregard the opinion . . . where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.*

11

(*quoting Miller v. Colvin*, 784 F. 3d 472, 477 (8th Cir. 2015)). *See also Halverson v. Astrue*, 600 F.3d 922, 930 (8th Cir. 2010) (treating physician's opinion appropriately afforded less weight when inconsistent with clinical treatment notes).

A nonexamining medical source opinion is generally given less weight than that of an examining source. *Papesh,* WL 3396586, at *5 (citation omitted). "[B]ecause nonexamining sources have no examining or treating relationship . . ., the weight [the Commissioner] will give their opinions will depend on the degree to which they provide supporting explanations for their opinions." 20 C.F.R. § 404.1527(c)(3).

The ALJ did not give great weight to Dr. Eiche's opinions because they were both completed after Herd's last insured date. In addition, the opinions were checklists and they were not accompanied by substantive explanations. The record also shows Dr. Eiche had limited contact—two sessions—with Herd prior to Herd's date last insured and at the time Herd was not receiving medication.

As for Dr. Masterson, he stated in May 2010 that Herd would find it difficult to maintain gainful employment, unless employed at a job where explosive anger was accepted and tolerated. At the time, Herd had just begun treatment with Dr. Masterson and was not yet taking any medications. Yet Dr. Masterson did not qualify his extreme opinion based on the medication he had just prescribed. Further, whether Herd is employable is an issue reserved to the Commissioner.

The Court will not disturb the ALJ's decision to give the opinions of Drs. Eiche and Masterson little weight. There is substantial evidence in the record to support his evaluation of their opinions.

### C. Personality disorder

The ALJ determined Herd had severe mental health impairments of intermittent explosive disorder and depressive disorder. Herd argues that the ALJ should have addressed his diagnosis of personality disorder and found it was a severe impairment at Step 2, and included limitations related to personality disorder in the RFC finding.

An ALJ's failure to address a question that should have been addressed does not mandate reversal. Reversal is necessary only if the failure prejudices the claimant. *Samons v. Astrue,* 497 F.3d 813, 821-22 (8th Cir. 2007) (citations omitted). An arguable deficiency in opinion writing technique is not grounds for reversal when that deficiency had no bearing on the outcome. *Robinson v. Sullivan,* 956 F.2d 836, 841 (8th Cir. 1992). In this case, the ALJ's failure to treat Herd's personality disorder as severe, did not prejudice Herd. The reasons given by the ALJ to deny benefits are equally applicable to Herd's personality disorder. Herd has failed to show how a diagnosis of personality disorder is so different from the mental disorders fully considered by the ALJ that a different outcome or different RFC would have occurred.

The RFC is based on substantial evidence on the record as a whole, and no prejudice appears. Therefore, the ALJ's RFC determination will not be disturbed.

### III. Conclusion

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated: June 15, 2015
Jefferson City, Missouri